UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA
LINCOLN DIVISION

| | |
|---|---|
| JOHN DOE, | |
|       Plaintiff, | |
| v. | Civil Action No. _____ |
| THE UNIVERSITY OF NEBRASKA-LINCOLN; | |
| TONI ANAYA,<br>*In her individual capacity;* | COMPLAINT AND<br>DEMAND FOR JURY TRIAL |
| MEAGAN COUNLEY,<br>*In her individual and official capacities;* | |
| *and* | |
| JANE ROE, | |
|       Defendants. | |

Somehow, the University of Nebraska found Plaintiff John Doe responsible for sexual assault and expelled him when his accuser admitted telling him, "fuck me sideways" during the sexual encounter. Instead of following the evidence, the University of Nebraska-Lincoln ("Nebraska" or "University") relied on sex-based stereotypes and sex-bias in order to erroneously find Mr. Doe responsible, rubberstamping false and defamatory allegations made by Defendant Jane Roe.

Accordingly, he files this Complaint against Nebraska and the individual Defendant employees of the University for violation of Title IX of the Education Amendments of 1972 to the Civil Rights Act. He also seeks damages, injunctive, and declaratory relief under 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Finally, he seeks damages to hold Ms. Roe to account for her malicious lies.

## PARTIES AND JURISDICTION

1.      Plaintiff John Doe[1] is domiciled in the state of Georgia and was, at all times relevant herein, a student at Nebraska.

2.      Defendant University of Nebraska-Lincoln is a public university with its principal place of business located in Lincoln, Nebraska.

3.      Defendant Toni Anaya is an employee of the University. She was appointed to be the Hearing Board chair in Mr. Doe's case. Upon information and belief, she is presently domiciled in the State of Nebraska.

4.      Defendant Meagan Counley is an employee of the University. She is the University's Title IX Coordinator, chiefly responsible for the University's compliance with Title IX. She is domiciled in the State of Nebraska.

---

[1] "John Doe" is not the Plaintiff's real name. Plaintiff will promptly move this Court for leave to proceed pseudonymously.

5.    Defendant Jane Roe[2] is domiciled in the state of California and was, at all times relevant herein, a student and resident at the University in Nebraska.

6.    This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because the federal claims in this lawsuit arise under the laws of the United States and the United States Constitution. This Court has supplemental jurisdiction over the state law claim because the state law defamation claim is so related to the federal claims as to form the same case or controversy. 28 U.S.C. § 1367.

7.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

8.    This Court possesses personal jurisdiction over the University because it is a Nebraska government entity, and over Defendants Anaya, and Counley by virtue of their domiciles in Nebraska. Personal jurisdiction is proper over out-of-state Defendant Roe because, among other things, she had minimum contacts with Nebraska at the time of the events and because she caused intentional tortious injury in Nebraska. Neb. Rev. Stat. § 25-536.

---

[2] "Jane Roe" is not the false accuser's real name. Her name is pseudonymized to prevent unwarranted embarrassment, in recognition of Plaintiff's request to proceed pseudonymously, and in the interest of resolving the claims in this case as efficiently as possible, avoiding disputes over pseudonymity.

## FACTS COMMON TO ALL CLAIMS

### Defendants' Motivation to Discipline Male Students

9.     Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX (20 U.S.C. § 1681). Title IX is a federal statute prohibiting discrimination on the basis of sex in education.

10.     Should the University fail to adequately remedy sexual harassment on campus, it could be very costly for the University, including having to face litigation from alleged victims of sexual assault. These plaintiffs tend to be female.

11.     In April 2011, pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter." This guidance, despite not having undergone the formal rulemaking process, demanded universities receiving federal funding weaken procedural protections for accused students, including limiting the right to a hearing for students accused of sexual harassment and lowering the burden of proof to preponderance of the evidence.

12.     The Dear Colleague Letter and later-issued guidance publicized statistics of an alleged rape epidemic on college campuses targeting female students. These statistics are demonstrably false and debunked.

13.     The Dear Colleague Letter incentivized universities receiving federal funding, including Defendant University, to find male accused students responsible regardless of the weight of the evidence against them because if the Department of

Education saw the University as insufficiently protective of alleged female sexual harassment victims, it could withdraw federal funding from the University.

14.    Defendant University receives federal funding.

15.    Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

16.    Therefore, the University and its employees had an incentive to find Mr. Doe responsible, as a male accused student, regardless of the lack of weight of evidence against him, to ensure it continued to receive federal funding.

17.    Thus, once Mr. Doe was falsely accused, the University and its employees had incentive to limit any chance Mr. Doe had at defending himself by subjecting him to an inherently unfair process.

18.    The Dear Colleague Letter was rescinded in 2017. The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions included a formal Title IX office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus. This operationalized the anti-male bias inherent in the Dear Colleague Letter and subsequent guidance, permitting that bias to remain in full force at the University after the federal guidance was formally rescinded.

19.    The author of subsequent guidance enforcing the Dear Colleague Letter, Assistant Secretary for Civil Rights of the Department of Education Catherine Lhamon, resumed her position at the Department of Education as of October 20, 2021, after a party-line confirmation vote in the United States Senate. Therefore, at

the time of the adjudication of the Title IX case involving Mr. Doe, Nebraska was on notice that a proponent of the Dear Colleague Letter, who expressed open hostility to male accused students in her confirmation hearings and past writings, was again in a position to withdraw federal funding from Nebraska if she felt that Nebraska was inadequately protective of female victims.

20.    Nebraska took no meaningful steps to ensure that individuals who investigated and adjudicated its Title IX matters were free of bias on the basis of sex. Its employees, however, were at least nominally trained or informed that they may not discriminate on the basis of sex or race.

<u>John Doe and Jane Roe</u>

21.    John Doe matriculated at Nebraska during Fall 2022 semester and was an athlete, recruited to join Nebraska's Men's Gymnastics Team.

22.    Mr. Doe is male.

23.    Jane Roe matriculated at Nebraska during the Fall 2021 semester and was an athlete, recruited to join Nebraska's Women's Tennis Team.

24.    Ms. Roe is female.

25.    As is common amongst the athletic community at Nebraska, the Men's Gymnastics Team and the Women's tennis team often associated with each other and ended up at the same events.

26.    At the end of the Spring 2023 semester, Mr. Doe met Ms. Roe. After this meeting, they began to talk often. They also would see each other in a manner Mr. Doe thought casual and somewhat romantic, including going on a couple of dates.

5

27.    Soon after this, Mr. Doe returned home for the summer. Despite the distance between the two, they talked on the phone often. When Mr. Doe was busy and would go most of the day without talking to Ms. Roe, she would ask Mr. Doe what he was doing and otherwise expressed a desire to communicate with him more frequently.

28.    Ms. Roe wanted an exclusive romantic relationship with Mr. Doe.

29.    Ms. Roe began to indicate, through behaviors like the above, to Mr. Doe that she wanted more from their relationship. Mr. Doe believed that she wanted to see him exclusively, as she had told him she was not a fan of "hook-up culture."

30.    "Hook up culture" generally means a culture where students would engage sexually with each other without any romantic commitment.

31.    When the summer of 2023 ended, Mr. Doe stayed with Ms. Roe and her family in St. Louis on the way back to Nebraska.

32.    As the Fall 2023 semester began, Mr. Doe and Ms. Roe began to see each other more and escalated the relationship from a casual one to a sexual one. They began to "hook-up," including several times during the month of September.

33.    Nevertheless, the two students never entered into an exclusive romantic relationship, and this irritated Ms. Roe.

34.    Throughout September and October, despite his ongoing non-exclusive relationship with Ms. Roe, Mr. Doe began to have feelings for and explore the option of getting back with his ex-girlfriend, a young woman that Ms. Roe knew about and did not like.

35.    Ms. Roe did not want Mr. Doe to get back together with his ex-girlfriend.

36.    On October 22, 2023, Nebraska's Football Team played a home game. Many colleges' athletic programs at the Division 1 level use college football games as recruiting tools for their programs. In keeping with this practice, the Nebraska Men's Gymnastics Team was hosting recruits to take them to the game.

37.    When Mr. Doe's team hosted recruits, the custom was to throw a party for them at the team duplex that night after the game. Mr. Doe oversaw some of the recruits they were hosting, so he attended the party.

38.    Given the close ties between the Men's Gymnastics Team and the Women's Tennis Team, members of the Women's Tennis Team usually attended these parties. Ms. Roe attended the party on October 22, 2023.

39.    Ms. Roe and Mr. Doe enjoyed the party and socialized throughout the night. Although both students were drinking socially, neither student was anywhere close to incapacitation or even significant inebriation.

40.    As the party progressed into the early morning hours of October 23rd, it became time for Mr. Doe to take the recruits back to their hotel. Ms. Roe asked Mr. Doe where he was going and told him several times that she wanted him to come back, including over text message, where she said, "Wait are you still coming back" followed up with "welll [sic], u better hurry up, hahahahaha"

41.    Mr. Doe was delayed at the hotel until the recruits were settled, which made Ms. Roe more desperate for Mr. Doe to return. She waited at the team's duplex for him until 2:45 in the morning.

42.    When Mr. Doe arrived back to the team's duplex, Ms. Roe told him that she wanted to go home with him that night. Mr. Doe asked if she wanted to go back to his place, but Ms. Roe asked him to go back to her place instead.

43.    Mr. Doe agreed to go back with Ms. Roe. Once they arrived, Ms. Roe led Mr. Doe to her bedroom. The pair talked for a while, and then, following her lead, they began consensual kissing and sexual touching.

44.    Eventually, Ms. Roe took her pants and underwear off and got up to retrieve a condom for Mr. Doe. They began to have sexual intercourse.

45.    At some point, with Ms. Roe's consent, Mr. Doe removed his condom. Ms. Roe, who was having her menstrual cycle, said playfully "you crazy" and later, mid-intercourse, told him "fuck me sideways."

46.    Mr. Doe was unable to reach climax, and the two stopped having sexual intercourse.

47.    Ms. Roe became then became upset and began crying. Uncomfortable with the surprising emotional outburst, Mr. Doe began to get dressed and get prepared to leave her room. While he was getting dressed, she exclaimed "did you ever care about me?" It was clear to the both of them that the casual relationship had ended.

48.    Mr. Doe began to feel bad for having ended things abruptly and for not being able to commit to Ms. Roe due to his feelings for another woman. When he awoke the next morning, his guilt had not left him. In an attempt at closure, he

messaged Ms. Roe on Snapchat expressing an apology for engaging sexually with Ms. Roe without committing to her as she had wanted.

49.    After this exchange, Mr. Doe had no further contact with Ms. Roe and began to move towards fully reconnecting with his ex-girlfriend.

50.    Crucially, at no point did Ms. Roe ever indicate to Mr. Doe that she did not want to have sexual intercourse. In fact, she led the way, initiating the entire encounter with Mr. Doe. She begged him to come back to the duplex, asked him to go home with her that night, led him to her bedroom, initiated the sexual contact, and made explicit verbal requests for certain sexual acts.

## Jane Roe files a Title IX Complaint

51.    Approximately 5 months passed. Mr. Doe had put this chapter behind him and fully reconciled with his ex-girlfriend in late October and early November of 2023.

52.    On February 14, 2024, Mr. Doe made that fact public through an Instagram post.

53.    Ms. Roe saw Mr. Doe's Instagram post announcing his new relationship.

54.    At some point after Ms. Roe saw that Mr. Doe was in another relationship, especially one with his ex-girlfriend, Ms. Roe became enraged. In an attempt at retribution, Ms. Roe filed a false Title IX complaint against Mr. Doe falsely alleging that he raped her in the early morning hours of October 23, 2023.

55.    On or around March 19, 2024, Mr. Doe received a letter, informing him that Ms. Roe had filed a formal complaint against him alleging that he had raped or

9

sexually assaulted her. Specifically, the letter paraphrased Ms. Roe's false allegations that:

1. You repeatedly asked Complainant to have sexual intercourse with you and Complainant repeatedly told you that she did not want to have sexual intercourse with you each time you asked.

2. After repeatedly telling you that she did not want to have sexual intercourse, you vaginally penetrated Complainant with your penis for approximate five minutes.

3. You removed the condom you were wearing. Complainant verbally told you she did not want to continue to have sexual intercourse without a condom. You continued to vaginally penetrate Complainant with your penis for approximately five additional minutes without a condom and without complaint's consent.[3]

56.     Mr. Doe was utterly shocked by this letter. he had not had contact with Ms. Roe in approximately 5 months, and while they did not part on friendly terms, she had never accused him of any misconduct whatsoever, and more importantly, was an enthusiastic participant in the sexual encounter until Mr. Doe – not Ms. Roe – stopped the encounter.

57.     Roe knew her complaint was false when she made it.

58.     That same day, a Title IX investigation was opened into Mr. Doe, per Nebraska Board of Regents Policy 2.1.8, which is designed to be compliant with federal Title IX regulations codified at 34 C.F.R. § 106.

---

[3] Sub-paragraphs 1-3 in paragraph 55 of the Complaint are taken verbatim from the Notice of Allegations sent to Mr. Doe by the University.

59.     Policy 2.1.8 and federal regulations require that Nebraska presume Mr. Doe "not responsible" unless and until a finding of responsibility is reached at the end of the grievance process.

60.     Policy 2.1.8 and federal regulations require that Nebraska never place the burden of proof or production on either student in the Title IX process; rather, the burden of proof and production are always on the University to prove by a preponderance of the evidence that Mr. Doe had violated Policy 2.1.8.

61.     34 C.F.R. §106.45(b)(2) requires the University to provide the Respondent with "adequate details" of the complaint so that he may prepare a response before an initial interview. One of the details required to be disclosed is the alleged date of the alleged misconduct.

62.     The University knew that Ms. Roe alleged misconduct on October 23, 2023, but did not include that date on the notice sent to Mr. Doe. Having been trained in the regulatory requirements, the University knew that it needed to provide Mr. Doe the date but it intentionally chose not to do so. Defendant Counley, the Title IX Coordinator, oversaw this violation of procedure and ratified it, or is otherwise responsible for it as Title IX Coordinator.

63.     From March 19, 2024, to October 7, 2024, Nebraska investigated Roe's complaint for sexual misconduct.

64.     The initial letter to Mr. Doe focused on potential violations of three provisions in Policy 2.1.8. The applicable provisions are (1) "Sexual assault;" (2) "Sexual harassment;" and (3) "Sexual misconduct" (numeration added).

11

65.    "Sexual assault" is defined under the policy as "an offense that meets the definition of rape, fondling, incest or statutory rape as used in the FBI's Uniform Crime Reporting system.

66.    "Sexual harassment" is defined as "conduct on the basis of sex that satisfies one or more of the following: (1) an employee of the University condition an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct; (2) unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the University's education program or activity; (3) sexual assault; (4) dating violence; (5) domestic violence; or (6) stalking" (numeration added).

67.    "Sexual misconduct" is defined as "(1) dating violence; (2) domestic violence; (3) rape; (4) sexual assault; (5) sexual harassment; (6) sexual exploitation; and (7) stalking" (numeration added).

68.    On April 24, 2024, Nebraska issued a no-contact order against Mr. Doe, barring him from having any direct or indirect communication with Roe, even through third parties. It also barred Mr. Doe from being around any classrooms where Roe would be present. Nebraska issued a similar no-contact order to Roe regarding Mr. Doe.

**Jane Roe alleges two versions of the same event**

69.    On or about April 1, 2024, Ms. Roe met with the investigator. During that interview, Ms. Roe falsely told the investigator that Mr. Doe had raped her.

12

70.     During Ms. Roe's interview, she testified that she had been drinking excessively for hours prior to the alleged incident and was drunk, she waited for hours for Mr. Doe to return after he had taken recruits back to their hotel, and once he returned at approximately 1:45 am, she said "want to go back to my place."

71.     Notably, this statement was inconsistent with her prior statement that she did not want to leave with Mr. Doe or that he was the aggressor. Further, despite alleging in her complaint that she told Mr. Doe "no" repeatedly, she made no mention of that "fact" during her interview and did not once tell the investigator that she told Mr. Doe that she did not want to have sex with him.

72.     The University referred the matter to a formal hearing for on or about September 26, 2024. Both Ms. Roe and Mr. Doe testified at the hearing.

73.     Ms. Roe contradicted herself again at the hearing. Embellishing on her original story from her complaint which was inconsistent with her statements to the Investigator, she testified that she had told Mr. Doe that "she did not want to have intercourse multiple, multiple times on the way up to her apartment that evening."

74.     She then described the encounter, stating that she led Mr. Doe to her bed, and they began kissing and sexually touching each other. Eventually, she took her pants and underwear off and then retrieved a condom for Mr. Doe. As they were having intercourse, Mr. Doe took off his condom. Although Ms. Roe's formal complaint stated that she told Mr. Doe "she did not want to continue to have sexual intercourse without a condom", at the hearing, Ms. Roe admitted she did not verbalize the words

13

"no" or "stop" in reference to sex without a condom. *Instead, Ms. Roe admitted to telling Mr. Doe, "you crazy" and "fuck me sideways."*

75.    Mr. Doe's testimony remained consistent. He corroborated the timeline of events that led up to the encounter, confirming that Ms. Roe had asked him to come to her place and had initiated the beginning of the sexual acts in question. He further testified that when he asked about intercourse, Ms. Roe replied, "if you want to" and then retrieved the condom for him. Once he took off the condom, he testified that she playfully said, "you crazy" and "fuck me sideways," confirming the statements that Ms. Roe admitted to making.

76.    When Mr. Doe was asked if he heard Ms. Roe ever say "no," he adamantly denied it. When he was asked by the hearing panel why he never heard it (an argumentative question that assumes Ms. Roe's version of events), he stated simply and clearly "because she did not say no."

## Nebraska's Sham Hearing and Decision

77.    The hearing panel was composed of three members, a librarian (Defendant Anaya), a professor, and a law student. The Chair was Toni Anaya, the Associate Director for Public and Information Services at Nebraska University Libraries.

78.    Nebraska was required to ensure that its hearing officers were not infected by any bias that would deprive students of their constitutional and civil rights.

14

79.    Defendant Counley was responsible for ensuring that the University did not violate students' rights in the Title IX process.

80.    Defendant Toni Anaya was appointed the chair of the Hearing Board by Defendant Counley.

81.    The formal hearing was held on September 26, 2024. During the hearing, Ms. Roe falsely told the hearing panel that Mr. Doe had raped her.

82.    The hearing panel's bias against Mr. Doe was apparent from the beginning, suggesting that there was in fact no due process and instead a pre-ordained outcome.

83.    Defendant Anaya was visibly hostile to Mr. Doe, as was another member of the hearing panel.

84.    For example, one of the panel members asked Mr. Doe: "Is this something you usually do and take advantage of drunk girls?"

85.    To put it mildly, the hearing panel did not presume Mr. Doe "not responsible" as it was required to do under law and University policy. Instead, it prejudged him because he was male.

86.    Further, the hearing board in essence rewrote Ms. Roe's complaint – instead of testing whether Mr. Doe forced himself physically on Ms. Roe as alleged in her complaint, the hearing panel pivoted and pursued a theory of whether Ms. Roe was too intoxicated to consent – a theory of rape not alleged in the complaint. Indeed, the hearing panel focused on the fact that Ms. Roe was "drinking all day" and was "feeling intoxicated." They did not consider that Ms. Roe had the presence of all her

faculties and the fact that this encounter was a part of a larger and ongoing relationship with Mr. Doe.

87.    Further, their focus on intoxication was selectively applied, as they found Ms. Roe consented to parts of the encounter but not others, during the same tie period.

88.    In addition, the hearing board failed to probe the obvious inconsistencies in Ms. Roe's testimony or the contradictions between her testimony and the evidence, as outlined above.

89.    After the hearing, with Defendant Anaya writing for the hearing panel, found Mr. Doe responsible for sexual harassment and sexual assault (specifically rape). He was sanctioned with expulsion from the university.

90.    Inexplicably, Defendant Anaya made no mention of the fact that Ms. Roe verbally stated, "fuck me sideways." Instead, she only included the comment "you're crazy," implying it was not a playful comment and played no role in affirming consent.

91.    Shockingly, Ms. Anaya stated that they found Ms. Roe's testimony "to be more credible and consistent with what was told to the investigator during the interview." She again made no mention of the fact that Ms. Roe first alleged she repeatedly told Mr. Doe "no," then denied saying that, then admitted that she actually told him "fuck me sideways."

92.    Defendant Counley reviewed Defendant Anaya's decision before it was sent to the parties or finalized.

16

93.     Following the decision, Mr. Doe timely submitted a seven-page single spaced appeal.

94.     In his appeal, Mr. Doe provided the University with, among other things, a listing and description of the conflicting statements showing that Ms. Roe's story had changed numerous times.

95.     Mr. Doe's appeal was summarily denied on November 21, 2024, in a two-page letter with no substantive discussion of the issues raised in his appeal. The appeal decision was nothing more than a rubber-stamp of Defendant Anaya's decision.

96.     Defendant Counley reviewed the appeal decision before it was sent to the parties or finalized.

97.     In the denial of appeal letter issued by the University, the University told Mr. Doe that the "decision is final, as there are no other steps for review under the University's Policy." The University never engaged in a substantive review of Mr. Doe's case, but simply sustained Defendant Anaya's decision and left Mr. Doe without any recourse.

98.     On the same day, Mr. Doe called the office of Dee Dee Anderson; the Vice Chancellor of Student Life whose name was on the appeal letter. Bizarrely, he was told she was on vacation and not available to talk on the same day she allegedly sent him the letter.

**Impact on Mr. Doe**

99.     As a result of this decision, Mr. Doe was expelled from Nebraska with a false finding of rape on his record.

100.    With the erroneous finding on Mr. Doe's record, he is effectively barred from undergraduate level education and employment requiring a background check.

101.    Further, as a result of the erroneous finding, Mr. Doe suffers immense emotional and psychological harm.

**CAUSES OF ACTION**

**COUNT I:**
**Violation of Title IX**
**(Against Nebraska)**

102.    Mr. Doe incorporates the above paragraphs by reference.

103.    Mr. Doe was a "person" at Nebraska, entitling him to rights under Title IX, codified at 20 U.S.C. §§ 1681 *et seq.*

104.    Nebraska receives federal funding.

105.    Nebraska discriminated against Mr. Doe on the basis of sex by granting preferential treatment to his female accuser throughout the investigation and adjudication of her claim and manifesting prejudice against Mr. Doe as a male throughout the same.

106.    Nebraska was motivated by pressure from the Department of Education and by its own ideological bias to find male students responsible and discipline them.

107.    Nebraska exhibited anti-male bias against Mr. Doe by (1) intentionally appointing a hearing chair and panel who were biased on the basis of sex; (2)

18

immediately believing the female complainant's statements, even when contradicted by evidence or inconsistency; and (3) intentionally failing to rectify these errors on appeal or to consider the relevant new evidence raised by Mr. Doe. This is a non-exhaustive list of Defendants' anti-male bias shown in this case.

108.    Nebraska's decision to discipline Mr. Doe and issue sanctions against him was motivated and caused by its bias against him on the basis of his male sex.

109.    There is no legitimate, nondiscriminatory reason for Nebraska's behavior.

110.    Even if a legitimate, nondiscriminatory reason exists, it is merely pretext for unlawful discrimination.

111.    Mr. Doe suffers severe harm as a result of this discriminatory process orchestrated against him. Therefore, Mr. Doe requests compensatory damages, declaratory relief in the form of a declaration stating Nebraska unlawfully discriminated against him on the basis of his sex, injunctive relief clearing his disciplinary record at Nebraska, and any other relief the Court deems just and proper.

## COUNT II:
### Violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution
### (Against Defendant Counley in her official capacity as Title IX Coordinator of Nebraska, under 42 U.S.C. § 1983)

112.    Mr. Doe incorporates the above paragraphs by reference.

113.    The University is a Nebraska government entity subject to the United States Constitution.

114.   The Fourteenth Amendment to the United States Constitution provides no state shall "deprive any person of life, liberty, or property, without due process of law."

115.   Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

116.   Mr. Doe had a property interest in his contractual relationship with Nebraska as a tuition paying student in good standing. As Mr. Doe did not commit a policy violation, he had a legitimate expectation in his continued education concurrent with his educational benefits.

117.   Mr. Doe had a liberty interest in his reputation and status as student in good standing because (1) he had an interest in pursuing his occupation of choice and (2) Defendants severely impaired his right to continued education or employment beyond Nebraska. Defendants erroneously stigmatized Mr. Doe as a student who committed a sexual misconduct violation and effected a change in his legal status by removing him from good standing with the University.

118.   Defendants, by their unlawful actions, altered Mr. Doe's legal status as student in good standing by issuing an expulsion.

119.   Defendants harmed Mr. Doe's liberty interest in his reputation by their erroneous determination that he committed sexual harassment and sexual misconduct, which impairs his education prospects and will forever harm him when he applies to jobs that require background checks or character and fitness evaluations.

120.    Defendants Counley and Anaya, acting on behalf of Nebraska, deprived Mr. Doe of his due process rights, including the right to an impartial decisionmaker.

121.    Defendant Counley also oversaw these deprivations of due process and impliedly or expressly ratified them as the official responsible for Title IX adjudications at Nebraska.

122.    Defendant Counley had the authority to rectify the due process deficiencies in this case. She chose not to do so.

123.    Defendant Counley, as an agent of the University and the State of Nebraska, had no legitimate governmental interest that outweighed giving Mr. Doe adequate procedural safeguards during the adjudication of the charges against him.

124.    This finding severely limits—if not destroys—Mr. Doe's future. With this finding on his record, Mr. Doe will very likely be unable to continue his education beyond Nebraska. He will certainly face severe and irreparable harm to his ability to seek professional employment, absent judicial intervention.

125.    Mr. Doe requests declaratory and injunctive relief against Defendant Counley in the form of (1) a permanent injunction prohibiting her or any agent of Nebraska from making or maintaining any notation on Mr.Doe's educational record relating to the investigation of Ms. Roe's complaint at Nebraska and from taking any further action depriving him of his constitutional right to due process; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Mr. Doe's right to due process.

## COUNT III
### Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution
### (Against Defendants Counley and Anaya sued in their individual capacities, under 42 U.S.C. § 1983)

126.    Mr. Doe incorporates the above paragraphs by reference.

127.    The University is a Nebraska government entity subject to the United States Constitution.

128.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

129.    Throughout the Title IX process at Nebraska, Mr. Doe was treated differently than Roe on the basis of sex.

130.    This differential treatment was a result of discriminatory animus as alleged *supra*.

131.    This discrimination serves no legitimate governmental interest because there is no legitimate governmental interest in refusing to adjudicate Title IX cases on their merits rather than the sex of the parties.

132.    If there is a legitimate governmental interest served by sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

133.    Mr. Doe requests compensatory and emotional damages including attorney's fees, punitive damages, and any other relief the Court deems just and proper, against Defendants Counley and Anaya sued in their individual capacities.

22

<u>COUNT IV</u>
**Violation of the Equal Protection Clause of the Fourteenth Amendment
to the United States Constitution
(Against Defendant Counley sued in her official capacity as Title IX Coordinator
of
Nebraska, under 42 U.S.C. § 1983)**

134.    Mr. Doe incorporates the above paragraphs by reference.

135.    Nebraska is a Nebraska government entity subject to the United States Constitution.

136.    The Fourteenth Amendment to the United States Constitution states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

137.    Throughout the Title IX process at Nebraska, Mr. Laing was treated differently than Roe on the basis of sex.

138.    This differential treatment was a result of discriminatory animus as alleged *supra*.

139.    This discrimination serves no legitimate governmental interest because there is no legitimate governmental interest in refusing to adjudicate Title IX cases on their merits rather than the sex of the parties.

140.    If there is a legitimate governmental interest served by sex discrimination in higher education disciplinary processes, the means employed in this case are not substantially related to the achievement of those objectives.

141.    Mr. Doe requests declaratory and injunctive relief against Defendant Counley in the form of (1) a permanent injunction prohibiting her or any agent of the University from making or maintaining any notation on Mr. Doe's educational record

relating to the investigation of the Roe's complaint at Nebraska and from taking any further action depriving him of his constitutional right to equal protection; and (2) declaratory relief in the form of a declaration that the adjudication at issue in this case violated Mr. Doe's right to equal protection and a declaration that the Equal Protection Clause bars sex discrimination in public higher education disciplinary proceedings.

<u>COUNT V</u>
**Defamation and Defamation Per Se**
**(Against Defendant Roe)**

142.    Mr. Doe incorporates the above paragraphs by reference.

143.    To recover under defamation, a plaintiff must prove: (1) a false and defamatory statement, (2) an unprivileged publication, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Norris v. Hathaway*, 561 N.W. 2d 583, 585 (Ne. Ct. App. 1997).

144.    In communications with the Title IX Office, Defendant Roe purposely caused to be published false and defamatory statements, both directly and by implication, about Mr. Doe with the intent on harming Mr. Doe.

145.    Specifically, Ms. Roe falsely alleged to the investigator and Title IX hearing panel that Mr. Doe had sexually assaulted or raped her and forced her to engage in sexual intercourse without her consent.

146.    Ms. Roe knew these statements were false when she made them.

147.    Defendant Roe, as alleged herein, made her statements with the design and intent of falsely painting Mr. Doe as a sexual predator. Defendant did so in a context that would cause reasonable listeners and readers to infer her intended defamatory meaning. Mr. Doe has suffered greatly as a result.

148.    A plaintiff may recover for defamation *per se* where a defendant's defamatory publications are (1) those which impute to a person the commission of a criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished; (2) those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society; (3) those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment; or (4) those which prejudice such person in his or her profession or trade.

149.    Defendant Roe's statements were defamatory per se because they falsely accused Mr. Doe of sexual harassment and misconduct, which at a minimum, prejudices Mr. Doe in his pursuit of his chosen profession or trade.

150.    Defendant Roe published the lies to the University, specifically the investigator and Title IX hearing panel.

151.    Those publications were false accusation of sexual harassment and sexual misconduct, which constitutes defamation *per se*.

152.    The defamatory statements have directly and proximately caused Mr. Doe to suffer significant damages, including pecuniary damages, damage to his

reputation, humiliation, embarrassment, and mental anguish, all of which are ongoing in nature and will be suffered in the future. These damages were foreseeable to Defendant Roe.

153.    Because Defendant Roe published the defamatory communications knowingly, intentionally, willfully, wantonly, and maliciously, with intent to harm Mr. Doe, or in blatant disregard for the substantial likelihood of causing him harm, Mr. Doe is entitled to an award of punitive damages.

154.    As a direct and proximate result of Defendant's conduct, Mr. Doe is entitled to compensatory, special, and punitive damages. Mr. Doe is also entitled to injunctive relief and to attorney fees for Defendant's malicious and wanton conduct.

## <u>JURY DEMAND</u>

155.    Mr. Doe hereby demands a trial by jury.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Mr. Doe respectfully requests that this Court grant him the following relief against all Defendants:

a.  Damages in the amount to be proved at trial;

b.  Costs of suit;

c.  Attorneys' fees, pursuant to 42 U.S.C § 1988(b);

d.  Injunctive relief in the form of expunging his disciplinary record; and

e.  Such other and further relief as the Court deems necessary and proper.


Dated: March 12, 2025                    Respectfully submitted,


                                         *s/ Benjamin North*
                                         Virginia Bar No. 97439
                                         Attorney for Plaintiff
                                         BINNALL LAW GROUP, PLLC
                                         717 King Street, Suite 200
                                         Alexandria, Virginia 22314
                                         Telephone: (703) 888-1943
                                         Fax: (703) 888-1930
                                         ben@binnall.com

27