IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN DOE,<br><br>              Plaintiff,<br><br>    v.<br><br>BOARD OF REGENTS OF THE<br>UNIVERSITY OF NEBRASKA; TONI<br>ANAYA, in her individual capacity;<br>MEAGAN COUNLEY, in her individual<br>and official capacities; and JANE ROE,<br><br>              Defendants. | **4:25CV3058**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the Court on defendant Jane Roe's ("Roe") Motion to Dismiss (Filing No. 25) plaintiff John Doe's ("Doe") First Amended Complaint (Filing No. 18) for lack of subject-matter jurisdiction and failure to state a claim.[1] *See* Fed. R. Civ. P. 12(b)(1), (6); 28 U.S.C. § 1367. Doe opposes dismissal on either grounds (Filing No. 34). For the reasons stated below, the motion is granted in part and denied in part.

## I.    BACKGROUND

Doe and Roe were both student athletes at the University of Nebraska–Lincoln (the "University"). He was a gymnast; she played tennis. Near the end of the Spring 2023 semester, they met at a joint team event and eventually began casually dating. Doe went home for the summer, but they stayed in contact, talking on the phone often.

---

[1]The Court notes that although Roe nominally moves to dismiss the First Amended Complaint (Filing No. 18), most of her references in her brief are to the original complaint (Filing No. 1). She is reminded "that an amended complaint supersedes an original complaint and renders the original complaint without legal effect." *Allen v. Amsterdam*, 132 F.4th 1065, 1068 (8th Cir. 2025) (quoting *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000)); *accord Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (explaining "the new pleading 'supersedes' the old one").

When the Fall 2023 Semester began, their relationship escalated "from a casual one to a sexual one."[2]  They had consensual sex several times that fall, but their relationship was not exclusive, though Doe believed Roe would have preferred an exclusive, romantic relationship.  Despite his ongoing relationship with Roe, in September and October, Doe began exploring the option of getting back together with his ex-girlfriend, who Roe "did not like."

On October 22, 2023, Doe and Roe both attended a party that the men's gymnastics team was throwing for potential recruits.  Both consumed alcohol.  The party continued through the night and into the next day.  When Doe left to take the recruits back to their hotel, Roe implored him to return.

At about 2:45 a.m., Doe returned, and he and Roe left together.  At Roe's request, they went back to her place where "Ms. Roe led Mr. Doe to her bedroom."  After they talked for a while, "they began consensual kissing and sexual touching."  Roe removed her pants and underwear "and got up to retrieve a condom for Mr. Doe.  They began to have sexual intercourse."

The parties disagree as to what happened next.  Doe alleges that while they were having sex, Roe consented to him removing his condom.  Roe, "who was having her menstrual cycle, said playfully 'you crazy' and later, mid-intercourse, told him 'fuck me sideways.'"  They stopped having sex when Doe was unable to climax.

Roe denies she ever consented to Doe removing the condom.  She states she "became the victim of 'stealthing,' a form of sexual assault wherein during a sexual encounter the other party removes the contraceptive barrier without the other person's consent."  (Footnote omitted).  Indeed, she had been reluctant to have intercourse in part because she was actively menstruating.  She says she relented under "Mr. Doe's badgering,

---

[2]Unless otherwise indicated, quotations in the background are drawn from the First Amended Complaint.

coercion, and emotional manipulation." She was not fully aware "until after intercourse ceased that" Doe independently chose to "stealth" her. From that point, she ended the relationship.

According to Doe, after sex, he prepared to leave because Roe was upset and crying. "While he was getting dressed, she exclaimed 'did you ever care about me?'" Doe understood their relationship was over. The next morning, he sent her a message on Snapchat apologizing "for engaging sexually with Ms. Roe without committing to her as she had wanted." They had no further contact after that.

On February 14, 2024, Doe posted on Instagram that he had "fully reconciled with his ex-girlfriend in late October and early November of 2023." Doe alleges the post enraged Roe and led her to file a false claim against him under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*

On or about March 19, 2024, Doe received a letter from University administrators advising him that Roe "filed a formal complaint against him alleging that he had raped or sexually assaulted her." Doe avers, "Roe knew her complaint was false when she made it." The University opened a Title IX investigation the same day and interviewed Roe on April 1, 2024. Doe alleges her later statement contradicted her initial report.

On or about September 26, 2024, the University held a formal hearing at which both Roe and Doe testified. The hearing panel consisted of three members, a professor, a law student, and defendant Toni Anaya ("Anaya"), the Associate Director for Public and Information Services at Nebraska University Libraries, who served as the panel's chair. Doe found the panel hostile and biased against him—unwilling to follow the law and its own procedures.

In her testimony before the panel, Roe accused Doe of raping her. Doe alleges Roe changed her story again while his account of consensual sex remained consistent. According to Doe, the panel "failed to probe the obvious inconsistencies in Ms. Roe's

testimony or the contradictions between her testimony and the evidence" in the case. He further alleges the panel "in essence rewrote Ms. Roe's complaint – instead of testing whether Mr. Doe forced himself physically on Ms. Roe as alleged in her complaint, the hearing panel pivoted and pursued a theory of whether Ms. Roe was too intoxicated to consent – a theory of rape not alleged in the complaint."

After the hearing, the panel found Doe "responsible for sexual harassment and sexual assault (specifically rape)" and expelled him from the University. Doe appealed to no avail. He avers the panel's erroneous finding of rape effectively bars him "from undergraduate level education and employment requiring a background check" and has caused him "immense emotional and psychological harm."

On March 12, 2025, Doe filed suit (Filing No. 1). He amended his complaint a couple of months later (Filing No. 18), asserting claims against the Board of Regents of the University of Nebraska (the "Board"), Anaya, Roe, and Meagan Counley ("Counley"), the University's Title IX Coordinator. Count I alleges a Title IX violation against the Board. Counts II and IV respectively allege due-process and equal-protection violations against Counley in her official capacity. *See* 42 U.S.C. § 1983. Count III alleges equal-protection violations against Counley and Anaya in their individual capacities. *See id.* And Count V alleges defamation and defamation per se against Roe under Nebraska law.

Roe seeks to dismiss the claims against her for lack of subject-matter jurisdiction and failure to state a claim. *See* Fed. R. 12(b)(1), (6); 28 U.S.C. § 1367.

## II.     DISCUSSION

### A.     Standards of Review

Roe first argues the Court lacks subject-matter jurisdiction to hear Doe's claims against her. *See* Fed. R. Civ. P. 12(b)(1). She states hers is "a facial attack due to [Doe's] failure to connect any federal law claim to the same factual basis out of which the state law claim arises as well as [his] failure to allege facts which may lead to a plausible outcome

4

in [his] favor." *See*, *e.g.*, *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (distinguishing between facial and factual attacks); *Compart's Boar Store, Inc. v. United States*, 829 F.3d 600, 604 (8th Cir. 2016) ("The plaintiff has the burden of proving subject matter jurisdiction.").

In evaluating a facial attack, the Court simply must "look and see if plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914 (8th Cir. 2015) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). The Court generally limits its review to "the pleadings and gives the non-moving party the same protections available under Rule 12(b)(6)." *Smith v. UnitedHealth Grp. Inc.*, 106 F.4th 809, 813 (8th Cir. 2024); *see also Carlsen*, 833 F.3d at 908 (explaining the proper review of a facial attack may include any materials "necessarily embraced by the pleadings and exhibits attached to the complaint" (quoting *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 668 (8th Cir. 2012))). In other words, the Court accepts the well-pleaded factual "allegations in the complaint as true and draw[s] all reasonable inferences in [Doe's] favor," *Absolute Essence LLC v. Pub. Consulting Grp. LLC*, 117 F.4th 1044, 1046 (8th Cir. 2024), but gives "no effect to conclusory allegations of law," *Stalley v. Cath. Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

"The Court will not dismiss for lack of subject-matter jurisdiction lightly. *See Wheeler v. St. Louis Sw. Ry.*, 90 F.3d 327, 329 (8th Cir. 1996). "Dismissal is proper, however, when a facial attack on a complaint's alleged basis for subject matter jurisdiction shows there is no basis for jurisdiction." *Id.*

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).

### B.    Supplemental Jurisdiction

Roe does not dispute that the Court has subject-matter jurisdiction over Doe's Title IX and § 1983 claims against the other defendants all of whom are associated with the University. *See* 28 U.S.C. § 1331. She likewise acknowledges that § 1367 authorizes the Court to exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *See also Royal Canin*, 604 U.S. at 27 ("[I]f a complaint includes the requisite federal question, a federal court often has power to decide state-law questions too."); *Hunter v. Page County*, 102 F.4th 853, 869-70 (8th Cir. 2024) (noting supplemental jurisdiction of related claims under § 1367(a) is mandatory, subject to § 1367(c)'s statutory exceptions and the "great latitude and substantial deference" district courts receive in deciding whether to exercise supplemental jurisdiction under those exceptions); *cf. United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (recognizing "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right").

Still, she argues the Court lacks supplemental jurisdiction because Doe's "case or controversy, for the purposes of this analysis, appears to be clear and cleanly differentiated between the facts giving rise to the federal claims and those giving rise to the state claim." In her view, her rape allegations (and his resulting defamation claims) "are wholly irrelevant to whether the other defendants discriminated against Mr. Doe" or violated his constitutional rights and preclude trying his state and federal claims together. The Court disagrees.

6

"The purpose of supplemental jurisdiction is to avoid duplicate, parallel, or divided litigation between federal and state courts." *Hunter*, 102 F.4th at 868 (citing *Richard D. Freer*, *Supplemental Jurisdiction—Background and Overview*, in 13D Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3567 (3d ed. 2008)). To that end, the Court should try state and federal claims together when they "derive from a common nucleus of operative fact." *Id.* (quoting *Gibbs*, 383 U.S. at 725); *accord Myers v. Richland County*, 429 F.3d 740, 746 (8th Cir. 2005) ("Claims within the action are part of the same case or controversy if they 'derive from a common nucleus of operative fact.'" (quoting *Gibbs*, 383 U.S. at 725)). "A plaintiff's claims derive from a common nucleus of operative fact if the 'claims are such that he would ordinarily be expected to try them all in one judicial proceeding.'" *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 963 (8th Cir. 2011) (quoting *Gibbs*, 383 U.S. at 725).

Accepting Doe's allegations as true and drawing all reasonable inferences in his favor, *see Absolute Essence*, 117 F.4th at 1046, the Court concludes his state and federal claims "derive from a common nucleus of operative fact" and should be tried together, *Gibbs*, 383 U.S. at 725. As alleged, Doe and Roe had consensual sex after a party. According to Doe, she initiated the sexual activity and enthusiastically participated but later became upset when she wondered if he ever actually cared about her.

Months later, when Roe found out Doe was getting back together with his girlfriend, she allegedly "became enraged" and "[i]n an attempt at retribution, [she] filed a false Title IX complaint against [him] falsely alleging that he raped her." Her initial report alleged he had sex with Roe both with and without a condom not only without her consent, but also over her verbal objection.

As the Board's investigation progressed, Roe allegedly changed her story. Rather than follow the evidence and exonerate Doe based on Roe's inconsistent and contradictory accounts, the Board allegedly "rubberstamped" her "false and defamatory allegations," improperly held him responsible for sexual harassment and assault, and expelled him. Far

7

from "irrelevant," Roe's alleged statements are central to both the state and federal claims. Regardless of the eventual merit of Doe's claims, they sufficiently arise from the same nucleus of facts to give the Court supplemental jurisdiction over his defamation claims under § 1367(a). *See Hunter*, 102 F.4th at 868-69; *ABF Freight*, 645 F.3d at 963.

### C.     Failure to State a Claim

Whether Doe states a plausible defamation claim presents a tougher question. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Moats v. Republican Party of Neb.*, 796 N.W.2d 584, 595 (Neb. 2011) (quoting Restatement (Second) of Torts § 559 at 156 (1977), *disapproved of on other grounds by Palmtag v. Republican Party of Neb.*, 999 N.W.2d 573 (Neb. 2024). Proving an ordinary case of defamation under Nebraska law "requires (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Palmtag*, 999 N.W.2d at 585. As pertinent here, statements are defamatory "per se only if they falsely impute the commission of a crime involving moral turpitude . . . or if they prejudice one in his or her profession or trade." *Matheson v. Stork*, 477 N.W.2d 156, 160-61 (Neb. 1991).

If "the plaintiff is a public official or public figure and the speech is a matter of public concern, the First Amendment requires the plaintiff to surmount certain higher barriers" to prove defamation. *Palmtag*, 999 N.W.2d at 585 (internal footnote omitted). One such barrier  requires the plaintiff to prove "'actual malice,' which means knowledge of falsity or reckless disregard for the truth, by clear and convincing evidence." *Moats*, 796 N.W.2d at 593-94. At the same time, "the First Amendment's protections of public debate are not absolute"—a person has "no constitutional right to espouse false assertions of facts, even against a public figure in the course of public discourse." *Palmtag*, 999 N.W.2d at 585.

8

Here, Roe primarily argues that Doe fails to state a plausible defamation claim because Roe's statements are entitled to absolute privilege because she made them in connection with a Title IX proceeding.[3]  Under Nebraska law, "[a]n absolutely privileged communication is one for which, by reason of its character or the occasion on which it was made, no remedy exists in a civil action for defamation."  *See Elbert v. Young*, 977 N.W.2d 892, 900 (Neb. 2022).  "Absolute privilege stems from a public policy determination that weighs the public interest in free disclosure against the harm to individuals who may be defamed."  *Kocontes v. McQuaid*, 778 N.W.2d 410, 416 (Neb. 2010), *abrogated on other grounds by Doe v. Bd. of Regents of Univ. of Neb.*, 788 N.W.2d 264 (Neb. 2010).

Such "privilege attaches to defamatory statements made incident to, and in the course of, judicial or quasi-judicial proceedings if the defamatory matter has some relation to the proceedings."  *Elbert*, 977 N.W.2d at 900; *see also Kocontes*, 778 N.W.2d at 416 (noting the privilege "applies to statements preliminary or ancillary to judicial or quasi-judicial proceedings" as well as "to witness testimony in a judicial proceeding").  A proceeding is quasi-judicial when the law charges a board or tribunal with deciding "matters based on the application of human judgment to some sort of factual investigation."  *Kocontes*, 778 N.W.2d at 416; *see also Shummway v. Warrick*, 189 N.W. 301, 302 (Neb.

---

[3]Relying on Restatement (Second) of Torts § 594, which does not appear to have been cited by any court applying Nebraska law, Roe alternatively claims a conditional privilege based on her important interest in her education.  She states that "a reasonable inference can be made that" she made the disclosures "at least in part, with the intent of availing herself of the intended benefit of the Title IX process."  But at this stage, the Court must accept Doe's allegations as true—including those of knowing falsehoods for retributive purposes (actual malice)—and must draw any reasonable inferences in his favor, not hers.  *See Absolute Essence*, 117 F.4th at 1046; *Potter v. Bd. of Regents of the Univ. of Neb.*, 844 N.W.2d 741, 754 (Neb. 2014) ("Conditional or qualified privilege comprehends communications made in good faith, without actual malice, with reasonable or probable grounds for believing them to be true, on a subject matter in which the author of the communication has an interest, or in respect to which the author has a duty—public, personal, private, legal, judicial, political, moral, or social—made to a person having a corresponding interest or duty.").  That puts all of Roe's proverbial Rule 12(b)(6) dismissal eggs in the absolute-privilege basket.

1922) ("When the law commits to any officer the duty of looking into facts and acting upon them, not in a way which it specifically directs, but after a discretion in its nature judicial, the function is quasi judicial." (quoting *Mitchell v. Clay County*, 96 N.W. 673, 678 (1903), *rev'd,* 98 N.W. 662 (Neb. 1904))).

In determining "whether a body is quasi-judicial," the Nebraska Supreme Court has found the following "six principal attributes" useful:

> (1) the power to exercise judgment and discretion; (2) the power to hear and determine or to ascertain facts and decide; (3) the power to make a binding order and judgment; (4) the power to affect the personal or property rights of private persons; (5) the power to examine witnesses, to compel the attendance of witnesses, and to hear the litigation of the issues at a hearing; and (6) the power to enforce decisions or impose penalties.

*Kocontes*, 778 N.W.2d at 416-17. The "body need not possess all six powers, but the more powers it" has, "the more likely it is to be acting in a quasi-judicial manner." *Id.* at 417.

Roe maintains the Title IX investigation she participated in was quasi-judicial. In support, she states that "[t]he Title IX Regulations published by the Department of Education specifically lay out rules which are to be followed which run adjacent to the underpinnings of the judicial system including: notice requirements, evidence, hearing procedures, impartiality, privilege, innocent until proven otherwise, and the opportunity to appeal adverse findings." (Citing 34 C.F.R. § 106.45(b)(1), (2), (5)(vi), (6), (8) ostensibly as were effective August 14, 2020, to July 31, 2024). She contends those regulations and due process ensured that the hearing panel acted constitutionally in adjudicating her rape claims. *See Doe v. Univ. of Ark.-Fayetteville*, No. 5:18-CV-05182, 2019 WL 1493701, at *13 (W.D. Ark. Apr. 3, 2019) ("Title IX regulations and the due process clause of the Fourteenth Amendment work in conjunction to ensure that hearing panel members and university officials act constitutionally in adjudicating sexual assault claims."), *aff'd in part, rev'd in part, and remanded sub nom. Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858 (8th Cir. 2020).

10

Doe acknowledges—as he must—that several of the "six principal attributes" appear to point in Roe's favor, *Kocontes*, 778 N.W.2d at 416, but he asks the Court to dig deeper. According to Doe, despite showing a veneer of an impartial adjudicatory proceeding, the Board's Title IX panels do not (1) exercise "judgment and discretion" like courts, (2) hear and decide facts like courts or juries, (3) finally adjudicate a contested matter like courts, (4) decide rights beyond a student's right to attend school, (5) have the power to subpoena witnesses and do not follow the rules of evidence like a court, or (6) have the power to enforce its decisions or impose penalties beyond expulsion. Doe further argues that the Board does not use an impartial decisionmaker in any real sense and opines that *Elbert* and *Kocontes* "make clear that, among other things, a proceeding is unlikely to qualify as quasi-judicial if it lacks subpoena power or a mechanism for imposing penalties on false statements."

Like the parties, courts have split on this burgeoning issue, generating thoughtful opinions on both sides that often turn on the particular procedures followed. In 2023, the Connecticut Supreme Court decided that Yale University's ("Yale") disciplinary proceedings "did not have adequate procedural safeguards to be recognized as quasi-judicial for the purpose of affording absolute immunity to" the complaining witness. *Khan v. Yale Univ.*, 295 A.3d 855, 879 (Conn. 2023) (considering certified questions of law from the United States Court of Appeals for the Second Circuit). In particular, the court found the procedures in that case

> failed (1) to require complainants to testify under oath or to subject them to explicit and meaningful penalties for untruthful statements, (2) to provide [the accused], or his counsel, the meaningful opportunity to cross-examine adverse witnesses in real time, (3) to provide parties a reasonable opportunity to call witnesses to testify, (4) to afford [the accused] the opportunity to have the active assistance of counsel during the [disciplinary] hearing, and (5) to provide [the accused] any record or transcript of the proceeding that would assist him in obtaining adequate review of [Yale's] decision or to expose the legitimacy or fairness of the proceeding to public scrutiny.

11

*Id.* Though acknowledging not all of those procedural safeguards need be present in every case, the court concluded their "collective absence . . . militate[d] against a determination that the proceeding had adequate safeguards to ensure reliability and promote fundamental fairness." *Id.*

The court did, however, conclude that public policy supported "providing a qualified privilege for statements made by individuals alleging sexual assault to proper authorities at institutions of higher education," subject to the plaintiff's "'opportunity to overcome the privilege in those rare instances [in which] a report is made, not in good faith, but rather with malice.'" *Id.* at 886, 888 (alteration in original) (quoting *Doe v. Roe*, 295 F. Supp. 3d 664, 676 (E.D. Va. 2018)). Of course, as noted above, such a conditional or qualified privilege is of no help to Roe at this stage. *See Khan*, 295 A.3d at 888 (explaining sufficient allegations of malice defeat the qualified privilege on a motion to dismiss).

On the other hand, the Colorado Supreme Court recently clarified that although due-process concerns were extremely important, "whether a proceeding is quasi-judicial is a separate inquiry from whether that proceeding offers sufficient due process." *Hushen v. Gonzales*, 570 P.3d 473, 476, 481 (Colo. 2025). Under Colorado law, regardless of the particulars of the process, a proceeding is quasi-judicial if it "involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts." *Id.* at 478 (quoting *Cherry Hills Resort Dev. Co. v. City of Cherry Hills Vill.*, 757 P.2d 622, 625 (Colo. 1988)). Because the Title IX proceeding in that case met that straightforward definition, the court concluded "any statements made during [that] proceeding [were] protected by absolute privilege and [could] not be used as the basis for a civil lawsuit against the participant who made those statements." *Id.* at 481.

The Colorado Supreme Court's bifurcated analysis in *Hushen* is relatively simple, and the Connecticut Supreme Court's qualified privilege in *Khan* theoretically offers some

12

sense of balance. But neither method is entirely in line with Nebraska's broader approach to determining whether proceedings are quasi-judicial. *See Kocontes*, 778 N.W.2d at 416, 423-24.

In its most-recent privilege cases, the Nebraska Supreme Court has analyzed a combination of the *Shummway* standard, the *Kocontes* attributes, and all relevant public-policy concerns in deciding that statements in a letter to the pardons board opposing a pardon application, *see id.*, an informal crime-commission complaint, and an "Allegation/Inquiry/Commendation" form containing allegations of dishonesty submitted to a local police department were all "protected by absolute privilege" because they related to a quasi-judicial proceeding, *Elbert*, 977 N.W.2d at 902. The possibility that the relevant statements were driven by vindictiveness, malice, hatred, or ill will did not deprive them of their absolute privilege despite even knowing falsity. *See id.* at 902-03 (calling such motives immaterial); *Shummway*, 189 N.W. at 302 (rejecting the appellant's reliance "upon the admitted fact that in publishing the libel defendant was actuated by malice, hatred, and ill will" because the Nebraska Supreme Court "is committed to the rule that, in judicial proceedings, the test of privilege is not the motive of the libelant but the relevancy and materiality of the matter published").

Having carefully conducted the same analysis here, the Court concludes Roe's challenged statements during the Title IX investigation and hearing are absolutely privileged. "There are certain relations of life in which it is so important that the persons engaged in them should be able to speak freely that the law takes the risk of their abusing the occasion and speaking maliciously as well as untruly." *Kocontes*, 778 N.W.2d at 416. This is such an occasion. Doe's attempt to recast the relevant procedural safeguards does not convince the Court otherwise.

To stave off dismissal, Doe asserts that the fact that "the Nebraska Supreme Court has never held that Title IX proceedings are quasi-judicial," by itself, indicates that they

are not.  He alternatively suggests in a footnote that "this Court should consider whether judicial economy warrants referring the question to the Nebraska Supreme Court."  *See* NECivR 7.4 (describing the certification process); Neb. Rev. Stat. § 24-219 (same).  He states he "*may* so move the Court."  (Emphasis added).  Doe's first assertion is unpersuasive; the second is unwarranted on this record.  *See Salier v. Walmart, Inc.*, 76 F.4th 796, 804 (8th Cir. 2023) ("Federal courts 'should be slow to honor a request for certification from a party who chose to invoke federal jurisdiction.'" (quoting *Smith v. SEECO, Inc.*, 922 F.3d 406, 412 (8th Cir. 2019))).

The Court is routinely called upon to predict how a state court might decide a novel issue of state law in the absence of binding precedent, particularly when the relevant legal landscape is rapidly changing.  *See Doe v. Univ. of St. Thomas*, 972 F.3d 1014, 1016-17 (8th Cir. 2020); *Smith*, 922 F.3d at 412 ("Absent a close question and lack of state sources enabling a nonconjectural determination, a federal court should not avoid its responsibility to determine all issues before it." (quoting *Shakopee Mdewakanton Sioux Cmty. v. City of Prior Lake*, 771 F.2d 1153, 1157 n.2 (8th Cir. 1985))).  And—as explained above—the Nebraska Supreme Court has given the Court an ample basis to predict that the Board's Title IX investigation constituted a quasi-judicial proceeding and that Roe's statements pertinent to that investigation are thus absolutely privileged under Nebraska law.  *See Univ. of St. Thomas*, 972 F.3d at 1016-17 (explaining a district court attempting to predict state law "may consider relevant state precedent, analogous decisions, considered dicta . . . and any other reliable data" (quoting *C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019))).  Leaving aside Doe's failure to actually move for certification, which is by itself fatal, *see* Fed. R. Civ. P. 7(b)(1) (requiring a detailed motion to request a court order), he simply gives no compelling reason to unnecessarily delay this case and drive up the costs of litigation by certifying a question this Court is competent to answer.  *See McKesson v. Doe*, 592 U.S. 1, 5 (2020) (per curiam) (explaining "[f]ederal courts have only rarely resorted to state certification procedures, which can prolong the dispute and increase the expenses incurred by the parties," because "[o]ur system of 'cooperative

14

judicial federalism' presumes federal and state courts alike are competent to apply federal and state law" (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974))).

In light of the foregoing,

IT IS ORDERED:

1.   Defendant Jane Roe's Motion to Dismiss the Plaintiff's Amended Complaint (Filing No. 25) is granted in part and denied in part.  Her request for dismissal for failure to state a claim is granted.  *See* Fed. R. Civ. P. 12(b)(6).  The motion is denied in all other respects.

2.   Plaintiff John Doe's claims against Roe are dismissed with prejudice, and Roe is dismissed as a defendant in this case.

Dated this 21st day of August 2025.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge